UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID JACKSON,                       )
                                     )
           Plaintiff,                )  09 C 4194
                                     )
     vs.                             )  Judge Feinerman
                                     )
ILLINOIS DEPARTMENT OF HUMAN SERVICES, )
                                     )
           Defendant.                )

**MEMORANDUM OPINION AND ORDER**

Plaintiff David Jackson alleges in this action that the Illinois Department of Human Services ("IDHS") violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, by failing to accommodate his disability during his employment and by terminating his employment. IDHS has moved for summary judgment. The motion is granted.

**Background**

The facts are set forth as favorably to Jackson as the record permits. In 1992, while serving the U.S. Navy, Jackson was in a car accident that eventually gave rise to post-traumatic stress disorder ("PTSD"). Since 2002, Jackson has received treatment for PTSD and related symptoms, including insomnia, anxiety, depression, difficulty concentrating, and dysthymia. Jackson's symptoms have been aggravated by the pressures of work and the stress of helping his ailing mother deal with her leukemia.

IDHS is responsible for providing Illinois residents with access to public aid programs. IDHS employees known as "caseworkers" process applications for food stamps, cash assistance, and medical assistance. IDHS hired Jackson in August 2008 as a Social Service Career Trainee

("SSCT"), which is a trainee for a caseworker position. To be certified for permanent employment as a caseworker, an SSCT must demonstrate that he can successfully perform the duties of a caseworker. As probationary employees, SSCTs are closely supervised and do not have the same case load as caseworkers. If an SSCT is not certified as a caseworker within the probationary period, his employment is terminated.

Jackson's immediate supervisor was Rebecca Finley, who in turn reported to Local Office Administrator Jaime Roman and Assistant Local Office Administrator Lynda Latson. In October or November 2008, complications from Jackson's mother's leukemia required the amputation of both of her legs. In November 2008, Jackson asked Latson if she knew of any state agency that could provide his mother with assistance. Jackson also asked IDHS's human resources department about the possibility of obtaining a leave due to his mother's condition, but was informed that as a probationary employee he was not eligible for leave under the Family Medical Leave Act. In December 2008, when Jackson missed work to attend his mother's surgery, Finley became extremely harsh and abrasive towards him. Jackson did not make Latson and Finley aware his mother's specific diagnosis until February 2009.

Jackson struggled from the outset of his tenure as an SSCT, making numerous errors while processing food stamp applications. Although IDHS sets no specific numerical objectives for accuracy, it generally expects SSCTs to make fewer errors over time. Latson observed that Jackson frequently socialized on the job, routinely asked coworkers for help on his cases, and habitually stared off into space while at his desk. For his part, Jackson understood that he was expected to make some errors because he was a trainee. Jackson denies that his performance was deficient, asserts that the need for improvement was not communicated to him in a clear and timely manner, and maintains that was his training was insufficient. Jackson asserts that the

performance problems he experienced at work were the result of the stress and anxiety caused by his mother's condition and by the pressure Finley placed on him. In addition to being harsh and abrasive toward Jackson, Finley did not provide him with sufficient assistance when he experienced difficulty with his cases. Jackson told Finley shortly after being hired that his PTSD becomes aggravated, resulting in anxiety and panic attacks, when he is approached from behind. Finley respected this sensitivity for a few months, but in December 2008 she began to loom over Jackson as he worked, inducing further anxiety.

Jackson's January 2009 performance review (Doc. 65-5 at 54-58), which Finley prepared, assessed Jackson as needing improvement in seven of eight areas: "job knowledge," "productivity," "quality," "initiative," "use of time," "planning," and "follow-up." Jackson assessed himself as needing improvement in only two of those seven areas and as meeting expectations in the other five. The review stated that Jackson had not demonstrated an ability to identify eligibility requirements for each category of public assistance or to complete food stamp applications; that he was able to complete only eighteen of thirty-three food stamp applications assigned to him; that "his work is a concern and needs improvement"; and that applications he processed were returned to him "numerous times for correction of repeated errors." The review reflected concerns about Jackson's tardiness, punctuality, and productivity, and reported that Jackson "has not made use of the training materials given to him from his agencies [sic] training sessions." Although Jackson now disputes the accuracy of the review, he signed it and acknowledged its contents (1) without checking the box stating "I DO NOT CONCUR" and (2) without writing anything in the space provided for the employee's comments.

Both before and after January 2009 performance review, Jackson handled fewer cases than an average SSCT. He frequently asked coworkers and Finley for help without first

consulting his training materials. After the performance review, Finley told Jackson to cease contacting his coworkers for assistance with his cases. Jackson's work continued to suffer. He was given at least one additional one-on-one training session, but afterward he successfully completed on the first attempt only sixteen of the twenty-five cases assigned to him.

On February 13, 2009, Jackson called IDHS to say that he would miss work due to a medical appointment at the VA hospital. This violated IDHS procedures regarding the use of benefit time, and Finley counseled Jackson about the proper procedures. On February 18, when Jackson asked Finley for help on a case without previously consulting his training materials, she counseled him about the proper procedures to follow when facing difficulties with a case. On February 20, Finley met with Jackson to counsel him regarding repeated errors he made on food stamp applications assigned to him. Although Jackson received counseling on February 20, the decision to terminate him had been made two days earlier, on February 18. Roman terminated Jackson on February 25.

In the months preceding his termination, Jackson requested accommodations due to the difficulties posed by his PTSD and his mother's health issues. Specifically, he requested a two-month leave of absence, permission to ask his coworkers for assistance with his cases, and transfer to a location closer to his mother's hospital. On February 2, 2009, Jackson's therapist sent IDHS a letter addressing Jackson's psychological difficulties and his mother's health. The letter attributed Jackson's problems at work to those circumstances and asked that IDHS "afford him similar considerations you'd afford yourself in dealing with this matter," but did not specifically request a leave of absence or any other accommodation. Doc. 77-2 at 7. Although Jackson did not follow IDHS procedures for requesting accommodations, Finley and Latson were made aware of his requests.

**Discussion**

Jackson claims that IDHS violated the ADA (1) by failing to accommodate his disability and (2) by terminating him due to his disability and to his association with his disabled mother. Both claims are considered in turn.

I.  **Failure to Accommodate Claim**

Jackson asserts that IDHS failed to accommodate him by not granting him a two-month leave of absence, by not permitting him to consult with coworkers regarding his cases, and by not granting him a transfer to an office closer to his mother's hospital. The ADA prohibits an employer from discriminating against an individual by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). "To establish a prima facie case for failure to accommodate under the ADA, [plaintiff] must show that: (1) [he] was disabled; (2) the [defendant] was aware of [his] disability; and (3) [he] was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position." *McPhaul v. Bd. of Comm'rs of Madison Cnty.*, 226 F.3d 558, 563 (7th Cir. 2000). "To survive a motion for summary judgment, a plaintiff must present the court with evidence that, if believed by a trier of fact, would establish all three elements" a prima facie case. *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 748 (7th Cir. 2011).

IDHS advances several grounds for summary judgment on Jackson's accommodation claim, but the only ground requiring discussion is that Jackson has not met his burden of demonstrating the third element of his prima facie case. The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.

§ 12111(8); *see Budde v. Kane Cnty. Forest Pres.*, 597 F.3d 860, 862 (7th Cir. 2010); *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 863-64 (7th Cir. 2005). The parties agree that the essential functions of the caseworker position—the position for which Jackson was a trainee, and the position whose functions a trainee must successfully perform to remain employed at IDHS—include "processing applications for public aid assistance; explaining eligibility criteria, requirements, policies, and procedures for public assistance programs; interviewing and collecting information and documents from clients to determine eligibility for services; applying IDHS rules to determine assistance levels and services; preparing, completing, and updating case file documentation; and referring clients to other IDHS, state, or private programs and services." Doc. 65 at ¶ 5; Doc. 77 at ¶ 5.

The undisputed facts demonstrate that Jackson was unable to perform these functions *without* reasonable accommodation. Jackson handled a considerably smaller caseload than his peers and failed to satisfy IDHS's expectation that his performance would improve over time. The January 2009 performance review—on which Jackson did not check the box indicating "I DO NOT CONCUR" and did not write anything in the space provided for his own comments—gives Jackson substandard marks on seven of eight parameters and otherwise reflects his poor performance. *See Ramirez v. Ill. Dep't of Human Servs.*, 711 F. Supp. 2d 853, 860-61 (N.D. Ill. 2010) (granting summary judgment to IDHS on the ground that SSCT was not a qualified individual where, among other things, he was evaluated as "need[ing] improvement" in five of eight parameters). The fact that Jackson rated himself substandard on only two of the eight parameters is insufficient to forestall summary judgment. As the Seventh Circuit recently held in analogous circumstances: "[The plaintiff's] own evaluation of his work cannot be imputed to [the employer], and is insufficient to permit his case to survive past summary

judgment. And although [the plaintiff] disagreed with his negative evaluations, that does not mean that the evaluations were the result of unlawful discrimination." *Dickerson v. Bd. of Trs. of Comty. Coll. Dist. No. 522*, __ F.3d __, 2011 WL 4349395, at *7 (7th Cir. Sept. 16, 2011) (citations omitted). Moreover, Jackson indisputably failed to comply with Finley's instruction to first consult his training materials before asking Finley or his coworkers for assistance. On this record, no reasonable jury could find that Jackson was capable of performing a caseworker's essential functions without an accommodation.

Nor could a reasonable jury find that Jackson was capable of performing the essential functions of the job *with* a reasonable accommodation. This is so for each of the three accommodations he proposed.

First, regarding the leave of absence, Jackson presents no evidence that a two-month leave would have allowed him to perform the job's essential functions. The letter from Jackson's therapist merely requested that IDHS be patient with him; nowhere does it say that a leave would alleviate his symptoms or remedy his deficient performance. Without evidence or any plausible basis to conclude that a two-month leave would have mitigated or solved Jackson's performance problems, Jackson cannot show, for summary judgment purposes, that he could have adequately performed the essential functions of the job if only he had been granted that accommodation. *See Winfrey v. City of Chicago*, 259 F.3d 610, 616-18 (7th Cir. 2001); *Webb v. Clyde L. Choate Mental Health & Dev. Ctr.*, 230 F.3d 991, 999 (7th Cir. 2000); *Ramirez*, 711 F. Supp. 2d at 860-61; *Harris v. Proviso Area for Exceptional Children*, 581 F. Supp. 2d 942, 958 (N.D. Ill. 2008) (holding on summary judgment that the plaintiff was not a qualified individual and noting that "[n]one of the doctors' notes suggest the possibility that Plaintiff could participate in physical interventions [required of the employee] with assistance").

Even if Jackson could surmount that hurdle, no reasonable jury could find that a two-month leave would have been a *reasonable* accommodation. The reason is plain: a leave of that length would have prevented Jackson from performing his position's essential functions, as "[c]ommon sense dictates that regular attendance is usually an essential function in almost every employment setting; if one is not present, he is usually unable to perform his job." *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (internal quotation marks omitted). In *Byrne v. Avon Prods., Inc.*, 328 F.3d 379 (7th Cir. 2003), the Seventh Circuit affirmed summary judgment for the employer because the employee's proposed two-month leave was not a reasonable accommodation; the court reasoned that while "[t]ime off may be an apt accommodation for intermittent conditions," the plaintiff's "only proposed accommodation is not working for an *extended* time, which as far as the ADA is concerned confesses that he was not a 'qualified individual.'" *Id*. at 381 (emphasis added).

Jackson's second proposed accommodation was that he be permitted to resume consulting with his coworkers on applications assigned to him. But IDHS reasonably expected that Jackson *himself* be familiar with public aid program eligibility requirements and be able to handle his caseload independently. *See Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912 (7th Cir. 1996) ("[H]iring a helper to perform the overhead work would mean a helper would de facto perform [plaintiff's] job. We cannot agree that [plaintiff] would be performing the essential functions of his job with a helper."). The proposed accommodation, moreover, is unreasonable as a matter of law. Given the large proportion of applications that Jackson processed erroneously, allowing him to regularly consult with others would have imposed a substantial burden on them and thus on IDHS's resources. As the Seventh Circuit has recognized, "courts have been reticent, as they should be, to require employers to provide accommodations that

necessitate the enlistment of another employee to assist an ADA claimant in performing the essential functions of his job." *Hammel*, 407 F.3d at 867 (citation omitted); *see also Peters v. City of Muaston*, 311 F.3d 835, 845 (7th Cir. 2002) (finding the plaintiff's accommodation request "unreasonable because it requires another person to perform an essential function of [the plaintiff's] job").

As for the third proposed accommodation, Jackson offers no explanation how transferring him to an IDHS facility closer to his mother's hospital would have been reasonable or would have enabled him to perform the essential functions of the job. No such explanation is apparent, and Jackson's failure to reference this particular accommodation in his response brief forfeits the point in any event. *See Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006); *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003).

In sum, because Jackson has not adduced evidence sufficient to allow a reasonable jury to find that he is a "qualified individual" within the meaning of the ADA, his failure to accommodate claim fails as a matter of law.

## II. Termination Claim

The ADA prohibits employers from terminating an employee based on an employee's own disability or association with an individual with a disability. *See* 42 U.S.C. § 12112(a), (b)(4). "As in other disparate treatment employment discrimination claims, a plaintiff may prove discrimination in violation of the ADA using one of two methods. Under the so-called 'direct' method, the plaintiff may show either direct or circumstantial evidence that points to a conclusion that the employer acted as it did for illegal reasons. The alternative way to prove discrimination is the familiar burden-shifting *McDonnell Douglas* method." *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006) (citations omitted).

A. **Termination Due to Jackson's Disability**

Turning first to Jackson's claim that IDHS terminated him due to his own disability, Jackson does not proffer any direct or circumstantial evidence of discrimination, and therefore must proceed under the *McDonnell Douglas* burden-shifting method. "Proceeding under this approach, a plaintiff must make a prima facie case of discrimination. Once he has done so, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. If the employer makes that showing, the burden shifts once again to the plaintiff to show the employer's stated reason is simply pretext for discrimination." *Ibid*. (citations omitted). To make a prima facie case of discrimination, Jackson must demonstrate that: "(1) [he] was a qualified individual with a disability … ; (2) he was meeting his employer's expectations … ; (3) he was subjected to an adverse employment action; and (4) the circumstances suggest that [his] disability was the reason the employer took adverse action against him." *Timmons*, 469 F.3d at 1127-28. Because Jackson has failed to adduce sufficient evidence on the second and fourth elements, summary judgment is warranted on his claim that he was terminated due to his own disability.

The second element of Jackson's prima facie case requires him to demonstrate that he was meeting IDHS's legitimate expectations. In conducting this inquiry on summary judgment, the court "must examine [Jackson's] performance at the time of the challenged adverse actions." *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 788 (7th Cir. 2007); *see also Timmons*, 469 F.3d at 1128. For the reasons discussed above, Jackson's work fell far short of IDHS's legitimate expectations, and no reasonable factfinder could conclude otherwise. *See Dickerson*, 2011 WL 4349395, at *6 (holding on summary judgment that the plaintiff did not meet legitimate expectations where his performance review rated him "'Unsatisfactory' in three of seven

categories," stated that he "'needs constant supervision or he will wander off jobs,'" and reported "that '[m]any times when [the plaintiff] is required to work with other staff members, they will request someone else to work with'"); *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 548 (7th Cir. 2008) (affirming summary judgment where performance evaluation reflected that the plaintiff did not meet expectations); *Squibb*, 497 F.3d at 788 (legitimate expectations were not met where the plaintiff missed significant amounts of work and received poor evaluations for lack of attention to detail).

Nor can Jackson satisfy the fourth element of his prima facie case: showing that his disability was the reason for his termination. In an effort to satisfy this element, Jackson maintains that IDHS treated similarly situated nondisabled employees more favorably than it treated him. *See Timmons*, 469 F.3d at 1128 (an employee may satisfy the fourth element "by demonstrating similarly situated nondisabled employees were treated more favorably"). "In determining whether two employees are similarly situated a court must look at all relevant factors." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). Jackson first points to Maria McCann-Fonseca, an SSCT who was given a six-week leave of absence after she sustained a medical emergency. McCann-Fonseca's situation is inapposite. As an initial matter, McCann-Fonseca had an acute medical problem requiring her immediate hospitalization and treatment. It does not diminish the seriousness of Jackson's mental health issues to say that the justification for granting McCann-Fonseca an extended leave was of a much higher order than that offered by Jackson—*i.e.*, mere speculation that a leave would allow him to control his anxiety and PTSD. Even putting that distinction aside, there is no evidence that McCann-Fonseca had any performance problems prior to her hospitalization, let alone problems on Jackson's scale. It follows that they are not similarly situated. *See Brown v. Ill. Dep't of*

*Natural Res.*, 499 F.3d 675, 682-83 (7th Cir. 2007) (affirming summary judgment on the ground that a problematic, abrasive, and insensitive employee was not similarly situated to alleged comparators who did not manifest those shortcomings); *Renta v. Cnty. of Cook*, 2011 WL 249501, at *3-4 (N.D. Ill. Jan. 26, 2011) (granting summary judgment on the ground that the plaintiff physician was not similarly situated to other physicians who had not committed nearly as many errors or deviated from protocol nearly as frequently).

Jackson also argues that other SSCTs who were not terminated in February 2009, but who continued training until they were laid off in August 2009, committed errors as well. Doc. 76 at 9. But Jackson provides no evidentiary basis on which a jury could determine that his coworkers' errors were as extensive or serious as his own; indeed, Jackson admits that he made more errors than his coworkers' did. *Id*. at 10. As with McCann-Fonseca, then, the other SSCTs are not similarly situated to Jackson.

### B. Termination Due to Jackson's Association With His Disabled Mother

Turning next to the associational discrimination claim, Jackson contends that direct and circumstantial evidence of discrimination can be found in his harsh treatment by Finley when he used benefit time to care for his mother in December 2008. Jackson admitted, however, that he did not disclose his mother's specific diagnosis to Finley until February 2009. The evidence therefore demonstrates, at most, that Finley exhibited hostility toward Jackson for taking time off; no reasonable juror could find that the evidence demonstrates animus by Finley toward Jackson or his mother based on her disability. *See Yancick v. Hanna Steel Corp.*, __ F.3d __, 2011 WL 3319568, at *14 (7th Cir. Aug. 3, 2011) (citing *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir. 1994), for the proposition that a plaintiff in an employment discrimination case "must show that the [employer's] hostility is based on a protected characteristic"); *Peters v.*

*Renaissance Hotel Operating Co.*, 307 F.3d 535, 548 n.11 (7th Cir. 2002) (affirming summary judgment in Title VII race discrimination case and explaining that while a negative remark by a member of management about the plaintiff "may demonstrate hostility … [,] all dislike is not based on race") (internal quotation marks omitted); *Pilditch v. Bd. of Educ. of City of Chi.*, 3 F.3d 1113, 1118-19 (7th Cir. 1993). It necessarily follows that the associational discrimination claim fails.

## Conclusion

For the foregoing reasons, IDHS is entitled to summary judgment.

September 28, 2011

_____
United States District Judge